Deborah A. JOHNSON, M.D.

v.

**EL PASO PATHOLOGY GROUP, P.A.
and El Paso Healthcare System, Ltd.
d/b/a Sun Towers Hospital.**

No. EP–93–CA–370–F.

United States District Court,
W.D. Texas,
El Paso Division.

June 27, 1994.

Order for Attorney's Fees July 28, 1994.

Thomas Spienczy, El Paso, TX, for plaintiff.

Joseph Hood, El Paso, TX, for defendants.

## MEMORANDUM OPINION
### AND ORDER

FURGESON, District Judge.

Alleging that she was fired because of her sex, Plaintiff Deborah A. Johnson ("Johnson"), a pathologist, sued Defendants El Paso Pathology Group, P.A. (the "Group") and El Paso Healthcare System, Ltd. d/b/a Sun Towers Hospital (the "System") for violating Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. The case was tried to the Court. Since Johnson demonstrated that her sex was a motivating factor for her termination, 42 U.S.C. § 2000e–2(m), the Court is of the opinion that she should receive the judgment of this Court in accordance with this Memorandum Opinion and Order.

### THE FACTS

Johnson is a female pathologist, board certified in all aspects of her specialty. In 1985, she came to El Paso to practice medicine as an employee of a professional association owned by Dr. Edwin Seaman ("Seaman"). The association provided pathology services on an exclusive basis to two El Paso hospitals, Sun Towers and Vista Hills. From the time of her arrival, Johnson practiced at Sun Towers and Seaman practiced at Vista Hills. Eventually, Johnson gained ownership in Seaman's professional association and the name of the association became Drs. Seaman and Johnson, P.A.

In 1988, El Paso Healthcare System, Ltd., a Texas limited partnership, acquired Sun Towers and Vista Hills. Thereafter, through their association, Johnson and Seaman continued to provide exclusive pathology services to the hospitals, which began to increase in patient census and case load. Sometime in 1990, both the hospitals and the association agreed that additional pathologists were needed to staff the increasing patient census and case load. The need was accentuated because Seaman was also experiencing health problems. Although the System believed the need was further accentuated because of complaints by other physicians regarding the pathology services at the System's hospitals, the record regarding complaints is minimal and certainly not substantial enough in any way to suggest that either

Seaman or Johnson were failing to perform their duties. To the contrary, the record indicates that, during the relevant time period, both pathologists performed their duties in a competent and conscientious manner.

After some initial staffing efforts in 1990 were unsuccessful, the parties agreed to recruit Dr. Mariano Allen ("Allen") to join Johnson at Sun Towers. Allen was practicing at a nearby hospital and was well-known and well-respected by the El Paso medical community. It was contemplated that he would work for Seaman and Johnson, P.A. on an equal basis with the owners. Serious negotiations were conducted between Allen, the System and Seaman and Johnson, P.A. Although it first appeared that Allen would move his practice to Sun Towers at the end of 1990, he changed his mind and decided not to.

In 1991, Seaman and Johnson continued their efforts to recruit additional pathologists for the two hospitals in the System. In April, 1991, they successfully concluded those efforts and signed employment contracts with Dr. Guadalupe Manriquez ("Manriquez") and Dr. Alicia Guajardo Murphy ("Murphy"). Both physicians were told that they would be on a partnership track with the association. Under the terms of the contract between the System and Seaman and Johnson, P.A., the System's consent was required before Seaman and Johnson could employ additional pathologists. The System gave its consent to employ the new physicians. Manriquez began her practice at Sun Towers in July of 1991 and Murphy began her practice at Vista Hills in September of 1991.

Nineteen-ninety-one was a crucial year in the relationship between the System and Seaman and Johnson, P.A. and particularly in the relationship between Johnson and the administration at Sun Towers. At the beginning of the year, Johnson worked with Chris Schneider ("Schneider") who was the Technical Laboratory Director of the pathology laboratory at Sun Towers. From all accounts, the two worked well together. Both, however, had problems working with George Sugawa, who was the Assistant Administrator or chief operating officer at Sun Towers, report-

ing directly to the chief executive officer of the hospital, Kevin Hicks ("Hicks").

Schneider left Sun Towers in February, 1991. Thereafter, in a memorandum dated March 15, 1991, entitled "Exit Comments," he wrote to Hicks to express his concern about Sugawa. Schneider complained about the "discriminatory comments" Sugawa made during "our search for additional pathology coverage...." Schneider quoted Sugawa as saying that "he wanted a man up there (as a pathologist in the lab) ... I don't want another woman." *Plaintiff's Exhibit 2.* The only woman pathologist at Sun Towers was Johnson. In Schneider's Exit Comments memorandum, he also stated that he "witnessed Mr. Sugawa making sexist comments about nurses and other female medical professionals in general." *Plaintiff's Exhibit 2.* In his deposition, Schneider told of additional instances of Sugawa's attitudinal problems with women in general and Johnson in particular. In one example, Schneider recounted a statement by Sugawa that, if Johnson did not stop meddling in hospital salary negotiations, "he would rip her tits off." *Plaintiff's Exhibit 23, Schneider Deposition,* p. 8. Although Sugawa denied making the "tits" comment, he did admit that he probably referred to women in the hospital as "bitches and broads." He also admitted that he probably used the reference in comments specifically about Johnson and hospital nurses. Since Schneider sent his Exit Comments memorandum to Johnson, she was well-aware of the views of Sugawa, the hospital's second ranking officer.

Although the System takes the position that Sugawa had no decision-making authority as to which pathologists would work in the hospital during the period relevant to the suit, Sugawa, as chief operating officer of Sun Towers, did have influence in all decision-making processes, including those relating to pathologists. Indeed, Hicks admitted that Sugawa had input and attended meetings where matters relating to pathologists were discussed. Moreover, as far as a hospital pathologist was concerned, Sugawa desired a male.

Even though Hicks himself denied that he had any preference for a male pathologist,

Schneider testified that Hicks told him that Hicks felt a male would do a better job than a female in relating to the medical staff. *Plaintiff's Exhibit 23, Schneider Deposition, p. 11.* Schneider's testimony is credible on this issue, even in light of Hicks' denial, because Hicks never followed up with Schneider after receiving the Exit Comments memorandum. *Plaintiff's Exhibit 23, Schneider Deposition, p. 10.* The charges were significant and warranted an investigation and a follow up. Even though he did not talk to Schneider, Hicks did talk to Sugawa about the memorandum and thought that such a discussion was sufficient "corrective action" with respect to the issues raised in the memorandum. Hicks did not know if his action could be considered a disciplinary action.

Hicks did nothing further about Sugawa's behavior, either by way of investigation or discipline. If Hicks had, he would have undoubtedly found out about Sugawa's references to women at the hospital as "bitches and broads." As it was, Hicks never learned of the comments. He admitted that, if he had learned of them, he would have considered the matter a "pretty big problem," requiring discipline to occur.

Even before Schneider wrote his "Exit Comments" memorandum, Johnson and Sugawa were at odds in regard to Johnson's input into laboratory matters at Sun Towers, as noted in the Schneider memorandum. Johnson clearly expressed her desire to have input and the record shows that she had good reasons for desiring input, one being that she had general responsibility for the laboratory in light of "Standards for Laboratory Accreditation" published by the College of American Pathologists. *See Defendants' Exhibit 17.* On the first page of the Standards, the responsibility is clearly stated:

> The pathology service [of the hospital] shall be directed by a physician or doctoral scientist qualified to assume professional, scientific, consultative, organizational, administrative, and educational responsibilities for the service. Generally, it is medically preferable that the director be a board certified pathologist. The director shall have sufficient authority to implement and maintain the Standards.

During Schneider's tenure, Sugawa sometimes thwarted Johnson's input into laboratory matters; however, the problems intensified after Sugawa hired Schneider's replacement, Mirna Ibarra ("Ibarra"), in the spring of 1991. In her job as Technical Laboratory Director at Sun Towers, Ibarra was required to work closely with Johnson in the operation of the hospital's pathology laboratory. She did not do so, however. Instead, she found it often inconvenient to meet with Johnson and ignored or disregarded much of Johnson's input. Ibarra's actions were consistent with the pattern already established by Sugawa, who knew the role of the medical director of the hospital's pathology laboratory but steadfastly refused to support Johnson in that role. Johnson, along with Manriquez, tried to get the cooperation of Ibarra, by using meetings and positive feedback. In a memorandum dated July 25, 1991, Johnson and Manriquez wrote to Ibarra to comment on the "very productive meeting" the three of them had had and to reiterate their (the physicians') "intention to take an active role in the laboratory." *Plaintiff's Exhibit 7.* Sugawa and Hicks received copies of the memorandum. Sugawa basically ignored the complaints of the physicians and, by his attitude, if nothing else, led Ibarra to ignore them as well. Eventually, the situation deteriorated to the point that Johnson resigned as medical director as of April 1, 1992. Even then, things did not improve and she finally went to the Chief of Staff of Sun Towers, Dr. Dionicio Negrete ("Negrete") to try to resolve the matter. She was not precipitous; she tried for over one year to solve the problem before she went to Negrete.

Negrete respected Johnson and understood the role a pathologist plays in a hospital's pathology laboratory. He was angered by Ibarra's conduct and met with Hicks and Sugawa to demand that she be fired. Sugawa argued against any disciplinary action toward Ibarra, clearly because he had encouraged her in the very conduct Negrete found so offensive. A compromise was reached and Ibarra was placed on six months' probation. *Defendants' Exhibit 54.*

One of the requirements of probation was that Ibarra develop and maintain a "professional attitude" with the hospital's pathologists. This one requirement is proof enough that Ibarra's prior attitude had been unprofessional, an attitude clearly fostered by Sugawa. In another setting, Ibarra and Johnson might have worked together well, because both women are competent and earnest about their work. The environment of Sun Towers did not allow such a result, however, because the attitude developed that the ranking pathologist had to be a male for there to be proper respect. Although Hicks' role in all of this was less aggressive than Sugawa's, he certainly never attempted to correct Sugawa or the situation and through inaction basically affirmed everything Sugawa did.

The attitude adopted by the System basically went unchallenged and unremedied except for Negrete's intervention. Indeed, his response alone is strong proof of how inappropriately Sun Towers acted toward Johnson; he condemned the attitude in a decisive way.

Now, the narrative must return to 1991. In the midst of the Johnson/Ibarra problems in the summer of 1991, the Joint Commission on Accreditation of Healthcare Organizations ("JACHO") conducted their accreditation investigation of Sun Towers. Such investigations are conducted every three years. The process is an intensive one and requires a major effort by physicians and staff in preparation. After completing its work at Sun Towers, the JACHO rendered its summation on September 11, 1991, and found pathology and laboratory at Sun Towers to be in "exceptional compliance." *Defendants' Exhibit 20 at p. 3.* The System's position at trial was that this excellent result should be attributed almost alone to Ibarra's efforts, although she had been at Sun Towers for barely six months when the investigation occurred. The efforts of Johnson, who had been medical director for the full three years since the last JACHO investigation, were discounted by Sun Towers and the System. Such a position is unwarranted and illustrates again how difficult it was for Sun Towers and the System to properly acknowledge the contri-

butions of the female medical director of the hospital's pathology department. By the end of 1991, Johnson was in the position of being undervalued and undermined by the System.

It was no real surprise, then, when the System went back to Allen at the end of 1991 and recruited him to take over the pathology work at the System's hospitals. The System had Allen create a professional association (the "Group") and then, on January 3, 1992, the System entered into a Full Service Management Agreement with the Group to provide exclusive pathology services for Sun Towers and Vista Hills. The contract with Seaman and Johnson, P.A. ended and its four pathologists were offered employment with the Group, to work under Allen's direction. Johnson' reaction to this change was a negative one and she told more than a few people that she did not plan to be a team player under the new arrangement. Nonetheless, she went to work for the Group and continued to perform her tasks professionally. Still, her relationship with Allen was uneven. As previously mentioned, she resigned as medical director on April 1, 1992, but remained as a pathologist at Sun Towers.

Johnson's relationship with the System and the Group deteriorated further. Sugawa and Ibarra were not cooperative and Johnson finally approached Negrete for help in August of 1992. Although she got the support she deserved, she apparently won the battle and lost the war. Steps which would lead to her termination began almost immediately thereafter.

After he took over the System's pathology services, Allen found it awkward to work with Johnson and Manriquez at Sun Towers. In a conversation with Seaman in September of 1992, Allen attributed his problems with Johnson and Manriquez to the fact that they were women. Allen is a courtly man and certainly never engaged in the same kind of conduct characterized by Sugawa, but he still was unable to build the comfort level necessary to establish a satisfactory working relationship with his two female counterparts. Consequently, he experienced a great deal of frustration with Johnson and Manriquez, in part because they were women who "cried" and had "headaches." It is Allen's position

that he said these things in a joking way to Seaman. The comments nevertheless suggest an underlying attitude which prevented Allen from relating to Johnson as a full person but instead caused him to relate to her from some stereotypical view toward women.

By September of 1992, Allen decided he could not work with Johnson. Sugawa testified that, at this time, he, Allen and Hicks met to discuss terminating Johnson. They finally decided to offer Johnson the opportunity to move to Vista Hills. According to Murphy, such an offer would have, at best, caused Johnson to make a real sacrifice as a physician, requiring her to essentially start over in a new position with new relationships to be established. When Johnson declined, Allen wrote her that the Group would not renew her contract. *Plaintiff's Exhibit 19.* The System and the Group decided to replace Johnson with Dr. Glenn Friedman ("Friedman"), who was contacted about the position around the time Johnson was offered the move to Vista Hills. The timing of the contact with Friedman leaves unclear the sincerity of the offer to Johnson to move; it may have been made with the certain belief that she would find the offer unacceptable. In the end Johnson was terminated as of December 31, 1992, and her replacement was a man.

Throughout the relevant time period, Johnson's behavior and attitude were not always exemplary, which probably exacerbated the problems between her and the System and Allen. There were instances when she yelled and cursed during conversations with Allen. She even kept a sign in her office for some period which read that people talking to her should be cautious because she could go from sweetheart to bitch in 30 seconds. Still, her actions were not of such a nature to warrant her termination or to warrant her sex being a motivating factor for her termination. After she was fired, she took the steps necessary to perfect her claim through the administrative procedures of the Equal Employment Opportunity Commission, and then she instituted this suit.

### DEFENDANTS AS "JOINT EMPLOYERS"

A jurisdictional issue confronts Johnson at the outset of her suit. Her employment contract was with the Group, which had less than fifteen employees. Therefore, unless the System, which had more than fifteen employees, was also her employer, she cannot maintain her suit under Title VII, 42 U.S.C. § 2000e(b). Johnson argues that Defendants were joint employers and cites the Court to the four factors set out in *Trevino v. Celanese Corp.,* 701 F.2d 397 (5th Cir.1983). Defendants argue that only the Group was Johnson's employer and cite the Court to the factors set out in *Diggs v. Harris Hospital–Methodist, Inc.,* 847 F.2d 270 (5th Cir.), *cert. denied,* 488 U.S. 956, 109 S.Ct. 394, 102 L.Ed.2d 383 (1988).

The fact situation in this case is more suited to an analysis under the *Trevino* case, and the Court is of the opinion that, under the factors outlined in *Trevino,* Defendants were the joint employers of Plaintiff. Therefore, the Court will analyze the *Trevino* factors first. Then, the Court will consider the applicability of *Diggs* to the instant case.

Before examining those points of view, however, the Court will discuss the argument of the System that Johnson could not legally have been an employee of the System because, under Texas law, physicians cannot be employed by entities other than those wholly owned by physicians. *Tex.Rev. Civ.Stat. art. 4495b, § 3.08(15) (1994).* The Court is not persuaded by the argument. In *Calderon v. Martin County,* 639 F.2d 271 (5th Cir.1981), the Fifth Circuit reversed a dismissal of a Title VII action where the District Court found there was no employer-employee relationship because of the restrictions of state law. According to the opinion in *Calderon,* state law was not controlling. A plaintiff's status as an employee under Title VII is a question of federal law, to be "ascertained through consideration of the statutory language of the Act, its legislative history, existing federal case law, and the particular circumstances of the case at hand." 639 F.2d at 272–73. Therefore, the inquiry in this case is not ended with citation to the Texas Medical Practice Act and its prohibition of non-physician entities employing physicians. Employer-employee status under Title VII

must be examined in light of the broad remedial purposes of the federal law and cannot be simply determined by reference to particular state employment laws. At the same time, it cannot be argued that, if the System is found to be Johnson's employer for purposes of Title VII, then the Medical Practices Act has been violated. There is no "Catch 22" operating in this interplay between state and federal law.

### a. The *Trevino* Test

In *Trevino*, the Fifth Circuit looked at four factors to determine whether "superficially distinct entities may be exposed to liability upon a finding that they represent a single, integrated enterprise: a single employer." 701 F.2d at 404. Those factors were (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control. *Id.* The Fifth Circuit also observed that courts focus on the second factor and ask what entity made the final decisions regarding employment matters. *Id.*

Since the focus is on centralized control of labor relations, that factor will be examined first. The record is clear that the System was significantly involved and ultimately controlled the Group's employment relations with its physicians. Under Paragraph 4.2 of the Full Service Management Agreement (the "Agreement") between the two entities, the number of physicians retained by the Group was to be determined in consultation with and upon the written consent of the System. *Defendants' Exhibit 22.* Under the same paragraph, the Group had to obtain the written approval of the System prior to replacing existing physicians or to engaging additional physicians, and the System administered the compensation and benefits for the physicians. As Allen testified, the Group and the System were a team, making joint decisions. The termination of Johnson was an example of the team concept, because the decision to terminate was done jointly, according to Allen. Certainly, by contract and by implementation, the System made the final decisions or at least reserved for itself the ultimate decisions regarding the physician employment matters for the Group.

It is also clear that the other three factors outlined in *Trevino* are satisfied in this case. Indeed, Paragraphs 2.1 and 2.2 of the Agreement alone illustrate interrelation of operations, common management, and common financial control. Under Paragraph 2.1, the Group appointed the System as "its sole and exclusive agent for the management and administration of the business functions and services" related to the Group's provision of Medical Services. Under Paragraph 2.2, the System had the responsibility and commensurate authority to provide "business, administrative and full management services" for the Group. This included, "without limitation, management, administration, billing and collection services, financial consulting, financial record keeping and reporting, preparation of financial statements and income tax returns, cash management services, contract negotiation, scheduling of non physician personnel, support services, non physician personnel, marketing and other business office services." Basically, the System had complete control over the operations, management, and finances of the Group. The control was so complete that the Group could not incur any liability exceeding $1,000 without permission of the System. Since the annual revenues of the Group exceeded $1,000,000, this limitation is a remarkable example of the pervasive extent of control the System exercised over the Group.

### b. The *Diggs* Test

As the above discussion illustrates, Defendants were joint employers under *Trevino*. Next, the Court will consider the applicability of *Diggs v. Harris Hospital–Methodist, Inc.*, 847 F.2d 270 (5th Cir.), *cert. denied*, 488 U.S. 956, 109 S.Ct. 394, 102 L.Ed.2d 383 (1988), to the present case. In the beginning, it must be noted that the *Diggs* factual background differs in significant respects from the background in this case. *Diggs* involved a plaintiff who was complaining about the termination of her staff privileges from the defendant hospital. Having staff privileges at a hospital is not the same as being employed by a hospital. Therefore, the issue in *Diggs* was not wheth-

er the plaintiff had joint employers but whether the hospital was an employer at all. An examination of part of the opinion from *Diggs,* 847 F.2d at 272–73 illustrates the difference:

If an employee–employer relationship existed between plaintiff Diggs and defendant Harris Hospital, undoubtedly Diggs has standing to bring a claim under Title VII. Harris Hospital does not dispute that it is an employer as defined by Title VII. The question here, then, is whether Diggs's relationship with Harris Hospital was one of employee or independent contractor. While the parties agree that the economic realities/common law control test of *Spirides* [*v. Reinhardt,* 613 F.2d 826 (D.C.Cir.1979)] is the appropriate standard, they disagree on the result of its application to the facts of this case. Harris Hospital argues that Diggs was an independent contractor, while Diggs contends that she was an employee.

We agree with the district court that Diggs was not an employee of Harris Hospital for purposes of Title VII. The economic realities of the work relationship, and the extent to which the one for whom the work is being done has the right to control the details and means by which the work is to be performed, with emphasis on this latter control factor. *Mares* [*v. Marsh*], 777 F.2d [1066] at 1067 [(5th Cir.1985)]. Additionally, courts are to consider the following factors in determining whether an employee–employer relationship exists for Title VII purposes:

(1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the 'employer' or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated; i.e., by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work

is an integral part of the business of the 'employer;' (9) whether the worker accumulates retirement benefits; (10) whether the 'employer' pays social security taxes; and (11) the intention of the parties.

*Broussard* [*v. L.H. Bossier, Inc.*], 789 F.2d [1158] at 1160 [(5th Cir.1986)] (quoting *Spirides,* 613 F.2d at 832).

As a matter of economic reality, Diggs, as an obstetrician-gynecologist, is dependent upon having hospital staff privileges in order to pursue her medical practice. There was no evidence submitted at trial, however, that privileges at Harris Hospital were necessary to her practice or that denial of staff privileges at Harris Hospital hampered her ability to obtain staff privileges at any other Fort Worth hospital. Furthermore, in determining her working relationship with the hospital, we are to focus more on the control factor. *Mares,* 777 F.2d at 1067. While the hospital supplies the tools, staff and equipment utilized by Diggs in delivering medical care at the hospital, and while it imposes standards upon those permitted to hold staff privileges, the hospital does not direct the manner or means by which Diggs renders medical care. Diggs is under no duty to admit any of her patients to Harris Hospital, and Harris Hospital does not pay her for her services.

The plaintiff in *Diggs* was a private physician who brought patients into the defendant hospital. She did not receive a paycheck from the hospital or from any association or group which performed exclusive services under contract with the hospital. Her patients paid for her services, which could be performed at other hospitals within the area. Johnson, on the other hand, depended entirely on the Group for her paycheck. She could not go to other hospitals outside the System to earn a living because, like the System, the other hospitals dealt exclusively with their own groups of pathologists. Finally, *Diggs* was not a joint employer case. The only question in *Diggs* was whether the hospital employed Diggs, not whether the hospital and some other entity jointly employed

Diggs. Under the circumstances, *Diggs* is not applicable to the instant case.

### SEX AS MOTIVATING FACTOR FOR TERMINATION

Based upon the facts in this case, the Court is of the opinion that sex was a motivating factor in the decisions of Defendants (1) to transfer Johnson from Sun Towers to Vista Hills Hospital and (2) to terminate Johnson's employment when she refused to move. Defendants argue that, in fact, Johnson was not terminated but rather was simply not renewed under her contract due to her refusal to accept a transfer to Vista Hills. Under the circumstances if Johnson was not terminated, then Defendants argue that Johnson's only possible alternative is to assert that she was "constructively discharged." Since constructive discharge can occur only when working conditions are so intolerable that a reasonable person would be compelled to resign, *Jurgens v. E.E.O.C.*, 903 F.2d 386 (5th Cir.1990), Defendants conclude that the facts here do not support constructive discharge because conditions for Johnson could not have been found to be so intolerable as to cause her resignation.

Although conditions were not good for Johnson at Sun Towers, the Court does not need to decide whether they were so intolerable as to cause a reasonable person to resign, because the Court does not believe that this is a constructive discharge case. Johnson did not resign. She was told not to come back. She was discharged, not constructively but actually. Although this Court cannot find any case exactly on point, it does not seem reasonable under Title VII that a plaintiff must accept a transfer motivated, in part, by sexual discrimination or else forfeit all of her other federally protected rights. See, for example, *Ellison v. Brady*, 924 F.2d 872, 882 (9th Cir.1991). Johnson was not required to accept a transfer motivated by the fact that she was a female to solve a problem that Defendants, not her, had created. Likewise, Defendants cannot now cite her failure to move as a justification for her termination, which was also motivated by the fact that she was a female.

Defendants also argue that Johnson failed to prove that the reasons given by her employers for their action were pretextual. In their Motion for Judgment as a Matter of Law, at pages 8–9, Defendants assert:

> Once plaintiff sets forth a prima facie case of discrimination, the burden shifts to the defendants to articulate a legitimate, non-discriminatory reason for their action. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254–55 [101 S.Ct. 1089, 1094–95, 67 L.Ed.2d 207] (1981). However, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff,' *id.* at 253. Thus, after the defendant articulates a non-discriminatory reason for its action, the burden shifts to the plaintiff to show that the articulated reason is pretextual. *Id.* at 256 [101 S.Ct. at 1095]. Plaintiff could have done this either directly by persuading the trier of fact that it was a discriminatory reason which more likely motivated the employer or indirectly by showing that the employer's proffered reason is unworthy of credence. *Id.* However, she has failed to do either.

From this assertion, Defendants then argue that Johnson was such a difficult person and so difficult to deal with that she was fired for that reason. Indeed, Defendants cite the fact that Allen found Johnson so difficult that he even tried to quit rather than work with her. Defendants believe that it was Johnson's personality rather than her sex that was the motivation for her termination.

The Court disagrees, however. Johnson was not difficult in the beginning. It was only after Defendants started the incessant drumbeat that women in general and Johnson in particular could not direct the pathology department at Sun Towers that she reacted to her situation. See, for example, *Hopkins v. Price Waterhouse*, 920 F.2d 967, 981 (D.C.Cir.1990). Although Johnson was not always wise in her reactions, it was not, in the end, those reactions which were the motivation for her termination. Instead, based upon the totality of the factual situation in this case, the Court is convinced that Johnson's sex was a motivating factor in

connection with her termination. If Defendants had re-evaluated their role in creating the awkward situation that existed with Johnson, the Court believes she would have been a positive contributor to the pathology department at Sun Towers. She was qualified; her past performance was acceptable; she was not the problem. Johnson has therefore met her burden; the discriminatory reason for her termination was proved to be the real reason for Defendants' actions. Defendants reasons for the termination are therefore a pretext.

Defendants argue against this conclusion, of course, even though the actions and words of representatives like Sugawa certainly are direct proof of discriminatory intent. To avoid the impact of Sugawa's conduct, Defendants argue that his words were merely stray comments, made well before Johnson's termination, by someone not a decisionmaker. It is unnecessary to repeat Sugawa's intemperate remarks, but it should be noted that Defendants' arguments fail to consider that the comments were totally unacceptable, were known by Johnson, were made with some regularity and were never condemned in any meaningful way by the System's management. Moreover, there is no evidence that Sugawa recanted or apologized to anyone about his comments. They could not, therefore, be limited in time to a period well before Johnson's termination. Finally, Sugawa was a decisionmaker. He was chief operating officer of Sun Towers and participated in some of the important meetings which finally led to Johnson's termination. Although Sugawa was not the only person who evidenced the discriminatory motivation for Johnson's termination, he is certainly a strong example of that motivation. Contrary to Defendants' arguments, the facts cause the Court to conclude that Johnson's termination was an act of discrimination against her based on her sex.

The final proof of this conclusion is that Johnson's replacement was a man. Defendants argue that, if Johnson had willingly transferred to Vista Hills Hospital, then she would have been replaced at Sun Towers by Murphy, another woman. They then conclude that her "real" replacement was thus to have been a woman. The fact is, however, that Johnson was terminated at Sun Towers and replaced by Friedman, a man, who had similar experience to Murphy but was paid substantially more than she was when he was hired. Defendants could have transferred Murphy to Sun Towers when they terminated Johnson; they chose not to do so. They replaced Johnson with a man rather than promote a fine pathologist who was already in their organization and who was a pleasant and attractive person in every way. The System and the Group wanted a man in Johnson's position. When the dust settled, a man was there. It was not an accident.

## DAMAGES

■ Although Defendants do not argue that this is a mixed motive case, primarily because they take the position that no improper motive was involved in Johnson's termination, the actual result of their argument, since the Court finds improper motive, is that the case involved mixed motive. A helpful dissertation on this concept is found in Friedman and Strickler, *The Law of Employment Discrimination*, (3d ed. 1993) (The Foundation Press, Inc.) at 162–63:

> One issue in *Price Waterhouse* [*Price Waterhouse v. Hopkins*, 490 U.S. 228 [109 S.Ct. 1775, 104 L.Ed.2d 268] (1989)] on which all the Justices agreed was the relationship between the causation determination and liability under Title VII; if the employer satisfies its burden of proving that it would have made the same decision absent discriminatory motivation, there is no Title VII liability. In the Fall of 1991 Congress enacted and the President signed the Civil Rights Act of 1991, Pub.L. 102–166, 105 Stat. 1071 (1991) which was intended in part to reverse *Price Waterhouse*. Section 107 of the that [sic] Act amends Section 703 of Title VII (Unlawful Employment Practices) by adding the following subsection:
>
>> (m) Except as otherwise provided in this title, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even

though other factors also motivated the practice.

The 1991 Act thus defines an unlawful employment practice to include any employment practice which is influenced in any manner by an unlawful motivation. But as the Act expands the scope of Title VII liability, it also restricts the kind of relief available in mixed-motive cases. Section 706(g) of Title VII generally provides for a wide range of remedies against an employer guilty of unlawful employment practices including reinstatement, back pay, compensatory and punitive damages.... Section 107 of the 1991 Act adds to Section 706(g) the following new subparagraph:

> (B) On a claim in which an individual proves a violation under section 703(m) and a respondent demonstrates that the respondent would have taken the same action in the absence of the impermissible motivating factor, the court—
> (i) may grant declaratory relief, injunctive relief (except as provided in clause (ii), and attorney's fees and costs demonstrated to be directly attributable only to the pursuit of a claim under section 703(m); and
> (ii) shall not award damages or issue an order requiring any admission, reinstatement, hiring, promotion, or payment, described in subparagraph [706(A) ].

Under the 1991 Act if a plaintiff proves that her discharge was in part the result of an unlawful motivation but the employer establishes to the court's satisfaction that, even absent the unlawful motivation, it would have discharged her anyway, the plaintiff may still be awarded a declaratory judgment, an injunction or attorney fees.

■ The Court does not believe, however, that the instant case is a mixed motive case which would limit damages. Absent the unlawful motivation, Defendants would not have discharged Johnson anyway. Her conduct which Defendants argue justified her termination was not, in fact, justification. Indeed, until Defendants began their impermissible conduct toward Johnson, her own conduct was not the subject of criticism or complaint. Therefore, the full range of damages are available to Johnson. Of these, the Court determines that back pay, compensatory damages of front pay and legal fees are appropriate.

■ Johnson has suffered lost back pay in the amount of $187,000.

Johnson has suffered compensatory damages of front pay for two years in the amount of $267,401. The Court believes damages for two years are appropriate because Johnson is a competent pathologist and should be able, with diligence, to find a position of comparable salary to her Sun Towers' position within a two-year period. The Court will enter its judgment accordingly.

Johnson should also be awarded legal fees. The Plaintiff shall file its Motion for Attorney's Fees within ten days after the judgment is entered.

Costs are imposed against Defendants.

### JUDGMENT

In accordance with the Memorandum Opinion and Order signed by the Court on June 23, 1994, the Court is of the opinion that Judgment should be entered for Plaintiff Deborah A. Johnson, M.D. in the above-captioned cause.

It is accordingly ORDERED, ADJUDGED AND DECREED that Judgment be entered on behalf of Plaintiff Deborah A. Johnson, M.D., against Defendants El Paso Pathology Group, P.A. and El Paso Healthcare System, Ltd. d/b/a Sun Towers Hospital, and that Plaintiff recover from Defendants the sum of $454,401 in damages plus interest, costs and attorney's fees.

### ORDER FOR ATTORNEYS' FEES

On this day, the Court considered Plaintiff's Fee Application, pursuant to Local Court Rule CV–7(j), filed on July 5, 1994, in the above-styled and numbered cause. Defendants failed to file a Response or any Objections to the Fee Application, timely or otherwise. Upon consideration of the Affidavits and supporting documentation, the Court is of the opinion the Fee Application and

Affidavits for reasonable Attorneys' Fees should be GRANTED.

In accordance with the Final Judgment entered by this Court on June 27, 1994, the Court enters its award of attorneys' fees and costs as they relate to proceedings pending before this Court. Counsel for Plaintiff requests $34,176.44 for attorney's fees and expenses.

## STANDARD FOR AWARD OF ATTORNEYS' FEES

The District Court shall allow costs as a matter "of course to the prevailing party unless" otherwise directed by the Court. Fed.R.Civ.P. 54(d); *See* 28 U.S.C. § 1920 (taxation of costs). However, under the "American Rule," "each party in a lawsuit ordinarily shall bear its own attorney's fees unless there is express statutory authorization to the contrary." *Hensley v. Eckerhart*, 461 U.S. 424, 429, 103 S.Ct. 1933, 1937, 76 L.Ed.2d 40 (1983). "Where a statute or contractual provision authorized a fee award, such an award becomes the rule rather that the exception, and should be awarded routinely as are costs of suit." *Engel v. Teleprompter Corp.*, 732 F.2d 1238, 1241 (5th Cir.1984). Further, the District Court can "enforce a valid fee-shifting provision as an exception to the American Rule." *Resolution Trust Corp. v. Marshall*, 939 F.2d 274, 279 (5th Cir.1991).

"The standard in this circuit governing the computation of attorney's fees is set out in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974) and its progeny." *Graves v. Barnes*, 700 F.2d 220, 221 (5th Cir.1983). The Fifth Circuit provided the following criteria: (1) the time and labor required; (2) the novelty and the difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorneys due to the acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) the time limitation imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Johnson*, 488 F.2d at 717–719.

The *Johnson* standard has been further refined by the Fifth Circuit's adoption of the "lodestar" method of calculating attorneys' fees. *Graves*, 700 F.2d at 222. "Under this refinement of the *Johnson* text, " '[t]he "lodestar" is equal to the number of hours reasonably expended multiplied by the prevailing hourly rate in the community for similar work. The lodestar is then adjusted to reflect other factors such as the contingent nature of the suit and the quality of the representation.'" *Id.* (quoting *Copper Liquor, Inc. v. Adolph Coors Co.*, 684 F.2d 1087, 1093 (5th Cir.1982)). The District Court "should not award a contingency multiplier in every case. Under appropriate circumstances, attorneys may be adequately compensated through the reasonable calculation of the lodestar." *Id.* at 224.

The District Court "is afforded broad discretion to determine the award of attorneys' fees." *Greenhaw v. Lubbock Beverage Ass'n*, 721 F.2d 1019, 1031 (5th Cir. 1983) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983)). In arriving at the appropriate amount, the District Court "must 'explain the findings and reasons upon which the award is based, including an indication of how each of the twelve criteria in *Johnson* affected his [or her] decision.'" *Copper Liquor, Inc. v. Adolph Coors Company*, 624 F.2d 575, 581 (5th Cir.1980) (quoting *In re First Colonial Corp.*, 544 F.2d 1291, 1300 (5th Cir.), *cert. denied*, 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388 (1977)). Although all twelve factors must be considered, the "*Johnson* criteria should be applied flexibly, not as a requirement that district courts parrot the twelve factors." *Gulf Union Indus., Inc. v. Formation Sec., Inc.*, 842 F.2d 762, 767 (5th Cir.1988).

The District Court "should pay special heed to *Johnson* criteria numbers (1) the time and labor involved; (5) the customary fee; (8) the amount involved and the result obtained; and (9) the experience, reputation, and ability of counsel." *Copper Li-*

*quor,* 624 F.2d at 583. The District Court should refer to the particularly applicable *Johnson* factors in the following framework: "(1) Ascertain the nature and extent of the services supplied by the attorney; (2) Value the services according to the customary fee and quality of the legal work; and (3) Adjust the compensation on the basis of the other *Johnson* factors that may be of significance in the particular case." *Gulf Union Indus., Inc.,* 842 F.2d at 767 (quoting *Copper Liquor Inc.,* 684 F.2d at 1092).

## CALCULATION OF ATTORNEYS' FEES

■ In the case *sub judice,* the prevailing party is entitled to reasonable and necessary attorneys' fees and expenses. Plaintiff is entitled to an award of attorney's fees pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.

### (1) THE TIME AND LABOR REQUIRED.

■ In determining the reasonableness of attorney's fees, the necessary starting point is to assess the amount of time spent by counsel on the case. *Johnson,* 488 F.2d at 717. In addition to a time sheet affidavits submitted by counsel, the Court should weigh the hours claimed by counsel in light of the Court's own experience and observations, and fashion a total time allowance which rationally reflects the services rendered. *Id.; McDonald v. Oliver,* 525 F.2d 1217, 1233 (5th Cir.), *cert. denied,* 429 U.S. 817, 97 S.Ct. 61, 50 L.Ed.2d 77 (1976). Moreover, investigation, clerical work, and other work which could be performed by a lay person should be distinguished from the time expended by counsel directed toward the merits of the case. *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.,* 487 F.2d 161, 167 (3rd Cir. 1973); *Foster v. Boise–Cascade, Inc.,* 420 F.Supp. 674 (S.D.Tex.1976), *aff'd,* 577 F.2d 335 (5th Cir.1978). In addition, counsel should indicate whether the person performing each task is a partner, associate, or paralegal. *Johnson,* 488 F.2d at 718, 719. Counsel submitted adequate affidavits and supporting documentation detailing the nature of the services rendered, the amount of time spent on such services, and the hours involved in each task performed.

### (2) THE NOVELTY AND DIFFICULTY OF THE QUESTIONS.

This Court is of the opinion that the legal issues involved in this case were neither novel or complex. Counsel for all parties completely addressed these issues. The Court is not of the opinion this factor warrants adjustment to the lodestar. The Court elsewhere has determined that the hourly rates as claimed are reasonable.

### (3) THE SKILL REQUISITE TO PERFORM A LEGAL SERVICE PROPERLY.

The best method the Court can utilize in assessing the skill of counsel for the prevailing parties is its own observation of the attorneys' work product. The Court finds counsel for the prevailing party ably and skillfully performed the legal services involved in this litigation, especially in responding to Defendants' dispositive motion.

### (4) THE PRECLUSION OF OTHER EMPLOYMENT BY THE ATTORNEY DUE TO ACCEPTANCE OF THE CASE.

The case in general did not preclude other employment opportunities for counsel.

### (5) THE CUSTOMARY FEE.

■ The District Court should select an hourly rate which reflects the "customary fee for similar work in the community." *Johnson,* 488 F.2d at 718. The Fifth Circuit Court emphasized the hourly rate should be varied by the District Court in accordance with the type of work being considered. Counsel for the prevailing party suggests the appropriate hourly rate, depending on his level of experience, is from $150.00 to $200.00 per hour. The Court is of the opinion that $175.00 per hour is a reasonable amount for Plaintiff's Counsel and is fairly representative of the customary fee for similar work in the community.

### (6) WHETHER THE FEE IS FIXED OR CONTINGENT.

The affidavit of counsel for the prevailing party reflects that this case was handled on an contingency basis. Had Plaintiff not pre-

vailed, her Counsel would not have received any renumeration for his services.

*(7) TIME LIMITATIONS IMPOSED BY THE CLIENT OR THE CIRCUM-STANCES.*

This Court finds that no special time constraints were imposed on Plaintiff's counsel by virtue of the nature of the case or the circumstances involved.

*(8) THE AMOUNT INVOLVED AND THE RESULTS OBTAINED.*

Plaintiff prevailed on her claim of sex discrimination and the Judgment in this case in the amount of $454,401.00. The Court notes Plaintiff's requested amount is not unreasonable when compared to the Judgment awarded.

*(9) THE EXPERIENCE, REPUTATION, AND ABILITY OF THE ATTORNEYS.*

As evidenced by the record and the Final Judgment recovered, the Court finds the prevailing party was ably served by their counsel who skillfully met the substantive and procedural challenges in this case.

*(10) THE "UNDESIRABILITY" OF THE CASE.*

The legal specificities of the case did not provide either undesirable hardships on behalf of counsel or inordinate economic impacts a contemporary "undesirable" case might present.

*(11) THE NATURE AND LENGTH OF THE PROFESSIONAL RELATIONSHIP WITH THE CLIENT.*

Upon consideration of the application and affidavits of counsel, the Court does not find that the length of the attorney-client relationship in this case is a factor to be considered.

*(12) AWARDS IN SIMILAR CASES.*

This Court finds the award in this case proper. Further, the work done by the prevailing party's counsel was necessary and reasonable.

**It is accordingly ORDERED** that Plaintiff's Fee Application and Affidavits for an Award of Attorneys' Fees are GRANTED.

**It is further ORDERED** that Plaintiff is hereby entitled to recover reasonable attor-ney's fees and costs from Defendants, in the amount of $34,176.44, plus interest thereon at the legal rate from date of Judgment in this cause.